UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| NANCY NAVA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF SANTA CLARA, et al.,<br><br>　　　　Defendants. | Case No.: C 08-3066 PSG<br><br>**ORDER DENYING-IN-PART AND GRANTING-IN-PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

　　　　On February 1, 2011, the parties appeared for hearing on Defendants' motion for summary judgment. Based on the briefs and arguments submitted,

　　　　IT IS HEREBY ORDERED that Defendants' motion for summary judgment is DENIED-IN-PART and GRANTED-IN-PART. The motion is denied as to all claims other than Plaintiff's claim under California Civil Code section 51.7, because there are genuine disputes of material facts about : (1) whether Defendants' seizure of Plaintiff was an investigatory stop or an arrest; (2) whether Defendants' had reasonable suspicion that Plaintiff was involved in wrongdoing to warrant an investigatory stop; and (3) whether the means used by Defendants to seize Plaintiff were reasonable. In addition, the constitutional rights that Plaintiff seeks to vindicate were clearly established as of September 18, 2007. The motion is granted as to Plaintiff's claim under California Civil Code section 51.7, because Plaintiff has submitted no evidence that her detention was racially motivated.

## I.  BACKGROUND

This case concerns claims of false arrest and excessive force pursuant to 42 U.S.C. § 1983 and California state law during a personal errand gone awry.

On November 18, 2007, at approximately 5:45 p.m., Plaintiff Nancy Nava drove her daughter Mickey, her son Carlos, and 4 year-old grandson Justin, to the Bank of America branch ("the Bank") located at 2900 El Camino Real, in Santa Clara, California, so that Mickey could do some banking.[1] Plaintiff drove her family in a blue Mazda Sport Utility Vehicle ("SUV") with two license plates.[2] Mickey, and eventually Carlos, went into the bank, leaving Plaintiff in the driver's seat and Justin seated immediately behind her.[3] Neither Plaintiff nor her family are African-American.

At approximately 5:50 p.m., a dispatcher alerted City of Santa Clara police officers to a report of suspicious circumstances at the Bank. An unnamed customer inside the Bank had reported a black SUV with no plates in the parking lot next to a silver vehicle. Both vehicles were reported to be parked immediately in front (i.e. west) of the main Bank entrance.[4] The customer further reported that an African-American man in the rear seat of the black SUV was holding a gun in his hand.[5] Two African-American woman in the front seat of the same SUV were also reported to have entered the Bank, done some banking and returned to their vehicle. An African-American woman was further reported as repeatedly entering and exiting the Bank.[6] The dispatcher further informed officers that the reporting party was afraid to go outside.[7]

Based on this report, between 15 and 20 Santa Clara police units and officers responded to

---

[1] *See* Nancy Nava Dep. ("Nancy Dep."), Decl. Anthony Boskovich Opp'n Mot. Summ. J. Ex. A (Docket No. 108-1) at 15:25–17:11, Mar. 9, 2009.

[2] *See* Nancy Dep. at 31:1–10, 33:10–16, 20–22; Carlos Nava Dep. ("Carlos Dep."), Boskovich Decl. Ex. D (Docket No. 108-4), Jul. 13, 2009.

[3] *See* Nancy Dep. at 35:11–36:11; Carlos Dep. at 10:23–11:3.

[4] *See* Dispatch Audio, Decl. Shannon Lawson Supp. Def.'s Mot. Summ. J. Ex. B (Docket No. 85-2) at 6:32 mark.

[5] *See* Dispatch Audio 6:42 mark.

[6] *See* Dispatch Audio 6:47 mark.

[7] *See* Dispatch Audio 6:56 mark.

the scene immediately.[8]  Officers in Unit 601 spotted two black SUVs to the rear (i.e., south) of the Bank, and shortly thereafter, a "dark-colored" SUV on the west side of the Bank.[9]  The officers saw that the dark-colored SUV on the west side of the Bank was occupied.[10]  The occupants, it would turn out, were Plaintiff and her grandson.

After speaking further with the reporting party, the dispatcher alerted officers that one of the African-American women associated with the situation was then walking out of the bank.[11]  Officers in Unit 604 responded by calling to the woman and having her walk toward them.[12]  The officers in Unit 604 then confirmed with the dispatcher that the woman was one of the same women previously identified.[13]

A few seconds later, the dispatcher clarified to Unit 604 that the African-American woman subject was actually associated with the silver vehicle that was parked next to the black SUV, and that she was the woman who reportedly kept going in and out of the bank.[14]  Officers attempted to get the reporting party to come out of the Bank to speak with them, but she refused because the African-American woman observed to be entering and exiting the Bank was still present at the scene.[15]

According to Defendants, it was critical that the parking lot be cleared of any potential threats prior to officers moving up to a position to clear the Bank.[16]  Lieutenant Mark Schaller, the highest-ranking officer on-scene, concluded that Plaintiff's SUV was most likely to be the primary

---

[8] *See* Dispatch Audio at 4:3, 14; Lawson Decl. Ex. A ("CAD") (Docket No. 85-1); Carlos Dep. at 14:1–4; Mike Seadler Dep., Boskovich Decl. Ex. C (Docket No. 108-3) at 42:1–2, Oct. 22, 2010.

[9] *See* Dispatch Audio at 8:18 and 8:48 marks.

[10] *See* Dispatch Audio at 9:07–9:17 and 10:19 marks.

[11] *See* Dispatch Audio at 9:27 mark.

[12] *See* Dispatch Audio at 9:42–9:58 marks.

[13] *See* Dispatch Audio at 12:35–12:50 marks.

[14] *See* Dispatch Audio at 13:15–13:29 marks.

[15] *See* Dispatch Audio at 20:12 mark.

[16] *See* Decl. Lt. Mark Schaller Supp. Defs.' Mot. Summ. J. (Docket No. 90) ¶ 9.

vehicle involved in what he determined was a potential bank robbery.[17] Lt. Schaller reached this conclusion because of, among other things: (1) the position of the vehicle (i.e., parked next to the silver vehicle, and therefore being parked where the reporting party said the armed man's SUV was); (2) the dark color of her SUV; (3) the presence of at least one African-American woman associated with the situation by the reporting party still present at the scene; and (4) the reporting party's fear and unwillingness to exit the Bank while the African-American woman was still present.[18]

Based on Lieutenant Schaller's conclusion, the officers then effected what Defendants describe as a "felony stop" or "high-risk stop" on Plaintiff.[19] According to Defendants, even when conducted in accordance with department training and other standards,[20] high-risk stops by their very nature can involve drawn weapons that are often pointed directly at the suspect. As a result, even though Plaintiff is a small woman and fully complied with the officers' commands,[21] at least 10 officers pointed their guns at her, removed her from her vehicle and grandson, and handcuffed her with her hands behind her back for 15 minutes, causing her pain in her wrists.[22] For some portion of the time Plaintiff was handcuffed, she was placed in a patrol car.[23] Plaintiff testified at her deposition that there were multiple guns pointed at her during the entire 15 minutes she was handcuffed, which would include the time she was sitting in the patrol car.[24]

The officers effected their high-risk stop even though one officer confirmed that the dark color of Plaintiff's SUV was not a color that he would mistake for black, as reported to the

---

[17] *See* Schaller Decl. ¶ 7; and Dispatch Audio 26:58 mark.

[18] *See* Schaller Decl. ¶ 7.

[19] *See* Schaller Decl. ¶ 8; CAD Printout at 3; and Dispatch Audio 30:12 mark.

[20] *See* Schaller Decl. ¶ 8.

[21] *See* Alex Torke Dep., Boskovich Decl. Ex. M (Docket No. 108-13) at 62:11–14, Oct. 25, 2010; and Seadler Dep. at 63:13–15.

[22] *See* Nancy Dep. at 41:23–25, 47:6–25; Carlos Dep. at 14:10–15:13, 26:1–8; Micaela Zamora Dep. ("Mickey Depo"), Boskovich Decl. Ex. B (Docket No. 108-2) at 24:11–18, Jul. 13, 2009; and Alan Wolf Dep., Boskovich Decl. Ex. F (Docket No. 108-6) at 44:14–45:17, Dec. 1, 2010.

[23] *See* Torke Dep. at 64:17–23, 67:7–20, 71:3–15.

[24] *See* Nancy Dep. at 47:6–5.

dispatcher.[25] In addition, at least 19 minutes[26] before detaining Plaintiff, the officers knew that:

1) Plaintiff's SUV *had* a license plate,[27]

2) "the blue SUV is not gonna be the vehicle. The rp advises, she insists it's the black SUV with no plate,"[28] and

3) "there's a black Mazda mini SUV with no plates on the south side of the bank. It is occupied by at least one male."[29]

After further contact was made with the reporting party, the dispatcher ultimately reported that the vehicle that contained the armed suspect was no longer in the lot. Plaintiff has submitted evidence that she was not promptly released from the handcuffs and patrol car after her SUV had been "cleared."[30] Eventually, Plaintiff was permitted to leave the scene.

## II.  LEGAL STANDARDS

### A.  SUMMARY JUDGMENT

The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses."[31] To obtain summary judgment, a party must demonstrate that no genuine issue of material fact exists for trial, and that based on the undisputed facts he is entitled to judgment as a matter of law.[32] The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any'

---

[25] *See* Seadler Dep. at 52:14–53:21.

[26] *See* CAD Printout; *see also* Dispatch Tr., Boskovich Decl. Ex. E (Docket No. 108-5) (transcribing Lawson Decl. Ex. B); and Schaller Decl. at 4:5–12.

[27] *See* Dispatch Tr. at 6:11–12.

[28] *See* Dispatch Tr. at 7:1–2; *see also*, Mark Schaller Dep., Boskovich Decl. Ex. H (Docket No. 108-8) at 55:3-20, Oct. 22, 2010; and Wolf Dep. at 27:21–28:3. Plaintiff has submitted evidence that her car was plainly visible to anyone inside the bank, including the reporting party, through its large front windows. *See* Nicholas Yan Dep., Boskovich Decl. Ex. I (Docket No. 108-9) at 14:21–15:3, Jul. 20, 2009; *see also*, Seadler Dep. at 79:5–11; Wolf Dep. at 29:13–19; and Dan Winter Dep., Boskovich Decl. Ex. G (Docket No. 108-7) at 35:19–36:7, Oct. 28, 2010.

[29] *See* Dispatch Tr. at 7:3-7; and Wolf Dep. at 27:9-20, 34:16–35:22.

[30] *See* Torke Dep. at 64:6–21, 73:2–74:12.

[31] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

[32] *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 322.

which it believes demonstrate the absence of a genuine issue of material fact."[33]

The moving party in not required to negate the elements of the non-moving party's case on which the non-moving party bears the burden of proof.[34] On the contrary, "regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[35]

On summary judgment, the non-moving party's evidence must be taken as true,[36] and the court must draw all reasonable inferences in favor of the non-moving party.[37] However, the non-moving party cannot defeat a properly supported motion for summary judgment simply by *alleging* a factual dispute between the parties; he must bring forth material facts, i.e., "facts that might affect the outcome of the suit under the governing law."[38] He "must do more than simply show that there is some metaphysical doubt as to the material facts."[39]

It is the court's responsibility to determine whether the specific facts set forth by the non-moving party, along with undisputed background or contextual facts, are such that a reasonable jury might return a verdict in favor of the non-moving party based on that evidence.[40] "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[41]

---

[33] *See Celotex*, 477 U.S. at 323.

[34] *Id.*

[35] *Id.* The court notes that the 2010 revisions to Rule 56 reordered some of the provisions, and the standard for granting summary judgment is now found in Rule 56(a) rather than 56(c).

[36] *See Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.")).

[37] *See Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991)

[38] *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-49 (1986).

[39] *See Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 588 (1986).

[40] *See T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630-31 (9th Cir. 1987).

[41] *See Anderson*, 477 U.S. at 248.

However, if the record taken as a whole could not lead a rational trier of fact to find in favor of the non-moving party, there is no "genuine" dispute for trial and summary judgment is warranted.[42]

### B.  QUALIFIED IMMUNITY

Qualified immunity shields government officials from civil liability under Section 1983 where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[43] "Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[44]

A police officer is entitled to qualified immunity from a civil rights action unless, under the particularized circumstances he faced at the time of his actions, it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted.[45] The issue of qualified immunity requires a court to determine: 1) whether the facts show the officer's conduct violated a constitutional right, and 2) whether the right was clearly established.[46] The court may evaluate the two prongs in any order.[47] It is the responsibility of the jury, not the judge, to determine any disputed foundational or historical facts that underlie the determination of whether an officer is entitled to qualified immunity.[48]

In qualified immunity cases, the plaintiff "bears the burden of proving that the rights she

---

[42] See Matsushita, 475 U.S. at 587.

[43] See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[44] See Pearson v. Callahan, 129 S. Ct. 808, 815 (2009).

[45] See Saucier v. Katz, 533 U.S. 194, 202 (2001).

[46] See Pearson, 129 S. Ct. at 816.

[47] See id. at 818.

[48] See Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099-1100 (9th Cir. 1995).

claims were 'clearly established' at the time of the alleged violation."[49]  The burden is on the government, however, to show that "a reasonable police officer could have believed, in light of the settled law, that he was not violating a constitutional or statutory right."[50]

While qualified immunity may apply to a federal civil rights claim under Section 1983, it has no application to similar California state law tort claims.[51]  Under California law, police officers are not immune from suit for use of excessive force in making an arrest, nor are they immune from suit for battery.[52]  Police officers are similarly not entitled under California law to immunity from suit for false arrest or false imprisonment.[53]

### C.  INVESTIGATORY STOPS AND ARRESTS

The Fourth Amendment's prohibition of unreasonable seizures is not limited to arrests; it applies to all seizures that occur "whenever a police officer accosts an individual and restrains his freedom to walk away."[54]  The amount of information that a police officer must have to justify a particular kind of seizure depends on the intrusiveness of the interaction.  A mere encounter during which "a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter" is not a "seizure" and thus does not implicate the Fourth Amendment.[55]  An "investigatory stop" or "*Terry*" stop" is a seizure that "fall[s] short of traditional arrest" and is governed by "a standard less than probable cause."[56]  In an investigatory stop, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that

---

[49] *See Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998) (citing *Davis v. Scherer*, 468 U.S. 183, 197 (1984)).

[50] *See Gasho v. U.S.*, 39 F.3d 1420, 1438 (9th Cir. 1994).

[51] *See Robinson v. Solano County*, 278 F.3d 1007, 1016-1017 (9th Cir. 2002).

[52] *See Scruggs v. Haynes*, 252 Cal. App. 2d 256, 267-268 (Ct. App. 1967).

[53] *See* Cal. Gov't Code § 820.4; *see also, Robinson*, 278 F.3d at 1016.

[54] *See Terry v. Ohio*, 392 U.S. 1, 16 (1968).

[55] *See Florida v. Bostick*, 501 U.S. 429, 436 (1991).

[56] *See United States v. Arvizu*, 534 U.S. 266, 273 (2002).

ORDER, *page 8*

criminal activity 'may be afoot.'"[57]  The most intrusive variety of seizure is an arrest, which must be supported by probable cause.[58]

In determining whether an investigatory stop turned into an arrest, courts consider the "totality of the circumstances."[59]  The Ninth Circuit has explained that:

> "In looking at the totality of the circumstances, we consider both the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted, *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir.1987) ("Whether an arrest has occurred depends on all the surrounding circumstances, including the extent to which liberty of movement is curtailed and the type of force or authority employed."), and the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken. *E.g., United States v. Jacobs*, 715 F.2d 1343, 1345-46 (9th Cir.1983) (per curiam). In short, we decide whether the police action constitutes a *Terry* stop or an arrest by evaluating not only how intrusive the stop was, but also whether the methods used were reasonable *given the specific circumstances*.[60]

The proper focus in determining whether the coerciveness or restraint used in a stop is sufficient to constitute an arrest is viewed from the perspective of the person seized, not from the perspective of the officers.[61]

Where government actors contend that a detention was merely an investigatory stop, they have the burden of showing that "under the totality of the circumstances, the intrusiveness of [the] seizure was reasonably necessary."[62]  If government fails to meet that burden, the stop is treated as an arrest.[63]

**D.   EXCESSIVE FORCE**

For both arrests and investigatory stops, claims of excessive force should be analyzed under

---

[57] *Id.* (quoting *Terry*, 392 U.S. at 30).

[58] *See, e.g., United States v. Watson*, 423 U.S. 411, 417 (1976).

[59] *See United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990).

[60] *See Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996)

[61] *See United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988).

[62] *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1053 (10th Cir. 1994); *see also, United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988) ("The government bears the burden to show that a warrantless seizure does not violate the Fourth Amendment").

[63] *See Melendez-Garcia*, 28 F.3d at 1053 ("Because the specific nature of this stop was not justified under the *Terry* doctrine, we must treat it as an arrest, requiring probable cause.").

the Fourth Amendment's "objective reasonableness standard."[64] In *Graham*, the Court set forth the factors relevant to an excessive force claim, "requir[ing] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[65] The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[66] The question of whether the use of force by police officers is reasonable is an issue to be determined by the jury.[67]

Ordinarily, drawing weapons and using handcuffs violates the Fourth Amendment when police only have reasonable suspicion to make an investigatory stop.[68] As the Ninth Circuit explained in *Washington v. Lambert*:

> "In this nation, all people have a right to be free from the terrifying and humiliating experience of being pulled from their cars at gunpoint, handcuffed, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists. The police may not employ such tactics every time they have an "articulable basis" for thinking that someone may be a suspect in a crime. The infringement on personal liberty resulting from so intrusive a type of investigatory stop is simply too great."[69]

### III. DISCUSSION

#### A. DEFENDANTS HAVE NOT SHOWN THAT, AS A MATTER OF LAW BASED ON UNDISPUTED FACTS, THEIR DETENTION OF PLAINTIFF WAS NOT AN ARREST

Defendants do not seek summary judgment that there was probable cause justifying an arrest of Plaintiff. Rather, Defendants argue that, as a matter of law, the high-risk stop of Plaintiff was a mere investigatory stop under *Terry v. Ohio*[70] that required only reasonable suspicion. Because a

---

[64] *See Saucier v. Katz*, 533 U.S. 194, 204 (2001) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

[65] *See Graham v. Connor*, 490 U.S. at 396.

[66] *Id.*

[67] *See Barlow v. Ground,* 943 F.2d 1132, 1135 (9th Cir. 1991).

[68] *See Washington v. Lambert*, 98 F.3d at 1187.

[69] *Id.*

[70] 392 U.S. 1 (1968).

reasonable jury viewing the facts in the light most favorable to Plaintiff could find otherwise, the court disagrees.

As the Ninth Circuit explained in *Washington v. Lambert*, the question of whether a police action constitutes a *Terry* stop or an arrest is evaluated based on both how intrusive the stop was and whether the methods used were reasonable given the specific circumstances.[71] Defendants have not shown that, given the specific circumstances here, a reasonable jury could only find that it was insufficiently intrusive for Defendants to order Plaintiff to get out of her car and abandon her four year-old grandson.  Nor must that same reasonable jury necessarily conclude that it was reasonable to put  Plaintiff in handcuffs in a patrol car at gunpoint for 15 minutes, all based on a report that an individual of a different race was seen with a gun in the back of an SUV without license plates that was a different color than Plaintiff's SUV, which had license plates.  That same reasonable jury also need not credit Defendants' justification that Plaintiff's SUV was parked in the location where an anonymous reporting party had said the other SUV was parked.[72]

Because Defendants have not asserted, much less established, that there was probable cause to support an arrest of Plaintiff, a reasonable jury's conclusion that Plaintiff was arrested necessarily means that summary judgment in Defendants' favor is not warranted.

**B.  DEFENDANTS HAVE NOT SHOWN THAT, BASED ON THE UNDISPUTED FACTS, THERE WAS REASONABLE SUSPICION THAT *PLAINTIFF* WAS INVOLVED IN WRONGDOING**

Even if a reasonable jury could only conclude that Defendants' detention of Plaintiff was an investigatory stop, Defendants have not shown that, as a matter of law, there was reasonable suspicion that Plaintiff was involved in wrongdoing so as to warrant her detention.  Defendants argue that their suspicions were reasonable because the officers "reasonably believed that individuals in and about the Bank parking lot were plotting to rob the Bank at gunpoint," "Lt. Schaller was concerned that the armed suspect or other suspects were still inside the Bank," and "[i]t was critical

---

[71] *See Washington v. Lambert*, 98 F.3d at 1185.

[72] *See Melendez-Garcia*, 28 F.3d  at 1052-53 (court treated seizure as an arrest rather than a *Terry* stop where "there was no evidence or testimony from the police that they had reason to believe ***these particular suspects*** had guns or were violent" or that the circumstances of the particular encounter "warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop") (emphasis added).

ORDER, *page 11*

that the parking lot be cleared of any potential threats prior to officers moving up to a position to clear the Bank."[73]

As the Supreme Court has explained, a key element "in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing."[74] In addition,

> "[r]easonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors — quantity and quality — are considered in the "totality of the circumstances — the whole picture," that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable."[75]

On the record before the court, Defendants have not shown that, as a matter of law, there was reasonable suspicion that Plaintiff in particular was involved in wrongdoing so as to warrant an investigatory stop of Plaintiff. At a minimum, a reasonable jury could conclude that any particularized suspicion as to Plaintiff and her SUV was insufficient, given the nature of the information supplied by the reporting party regarding the color of the SUV, whether it had license plates, and Plaintiff's ethnicity.

C. **EVEN IF AN INVESTIGATORY STOP OF PLAINTIFF WAS WARRANTED, DEFENDANTS HAVE NOT SHOWN THAT AS A MATTER OF LAW THAT THEY WERE NOT EXCESSIVE IN PULLING PLAINTIFF FROM HER CAR AT GUNPOINT, HANDCUFFING HER, PLACING HER IN A PATROL CAR AND KEEPING MULTIPLE GUNS POINTED AT HER FOR THE 15 MINUTES SHE WAS HANDCUFFED**

Nowhere in their briefs do Defendants explain why a reasonable jury could only conclude that Defendants did not use excessive force when they: (1) pointed multiple guns at Plaintiff after she was removed from her vehicle and complying with Defendants' commands; (2) pointed guns into Plaintiff's vehicle where they knew a child was sitting in the back seat; and (3) held Plaintiff at

---

[73] Mem. Points Auth. Supp. Defs.' Mot. Summ. J. (Docket No. 87) at 16:17.

[74] *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

[75] *Alabama v. White*, 496 U.S. 325, 331 (1990) (citation omitted).

1   gunpoint in a patrol car with her hands cuffed behind her back for 15 minutes.[76]

2   None of the cases cited by Defendants involved use of such intrusive measures with an individual who is complying with all police commands, and for whom there have been no reports of the use or possession of a gun.

For example, in *Alexander v. County of Los Angeles,* the Ninth Circuit found it was reasonable to order bank robbery suspects out of their car at gunpoint because "the officers had information that the robbery suspects *had fired on a witness* and thus had reason to believe the suspects were armed and dangerous."[77] The court also found the use of handcuffs reasonable "because it 'eliminated the possibility of an assault or escape attempt during the questioning.'"[78] Unlike the situation in *Alexander*, in the present case there was no crime committed prior to Plaintiff's detention, Plaintiff did not match the description of the person seen with a gun, and there was no report of anyone matching Plaintiff's description possessing or firing a gun. A reasonable jury could find that Defendants did not have any reason to believe Plaintiff was armed and dangerous or posed any threat to any of the dozens of officers present. Such a jury could particularly rely on the fact that after Defendants ordered Plaintiff from her car at gunpoint and "cleared" her vehicle, there is no evidence that Plaintiff behaved in a confrontational manner either before or during her detention.

### D. PLAINTIFF HAS SHOWN THAT THE RIGHTS SHE CLAIMS WERE VIOLATED WERE "CLEARLY ESTABLISHED" AT THE TIME OF THE INCIDENT

The framework for determining whether an encounter is an investigatory stop as opposed to an arrest was clearly established, and explained in detail, by the Ninth Circuit in 1996 in the *Washington v. Lambert* case.[79] The *Washington v. Lambert* case also clearly established the "right to be free from the terrifying and humiliating experience of being pulled from [one's car] at gunpoint,

---

[76] Plaintiff has submitted evidence in support of these alleged facts, and as noted above, for purposes of this motion Plaintiff's evidence must be believed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 255.

[77] *Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir. 1995) (emphasis added).

[78] *Id.* (citation omitted).

[79] *See Washington v. Lambert*, 98 F.3d at 1185-87.

handcuffed, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists."[80]  Because Plaintiff seeks to vindicate the very same rights articulated in *Washington*, a case decided over a decade before the events at issue in this case, the court must conclude that Plaintiff's claimed rights were "clearly established."

### E. EXCEPT FOR PLAINTIFF'S CLAIM UNDER CIVIL CODE SECTION 51.7, SUMMARY JUDGMENT IS NOT WARRANTED AS TO PLAINTIFF'S STATE LAW CLAIMS

In their moving papers, Defendants argue that Plaintiff's claims under California Civil Code section 51.7 because there is no evidence that Plaintiff was singled out for disparate treatment due to race.  Plaintiff did not respond to this argument in her opposition, and has submitted no evidence that her detention was racially motivated.  Thus, summary judgment is warranted as to Plaintiff's claim under California Civil Code section 51.7.

Defendants also argue they are immune from Plaintiff's state law claims based on California Civil Code sections 820.2 and 820.4.  However, the immunity under Section 820.2 is not absolute and liability may be imposed in some circumstances, such as where an officer uses excessive force, acts unreasonably or falsely arrests someone.[81]  Section 820.4 expressly states "Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."  As discussed above, Defendants have not shown that, as a matter of law, they acted reasonably.  Thus, summary judgment in favor of Defendants is not warranted as to Plaintiff's remaining state law claims (other than the Section 51.7 claim).

## IV. CONCLUSION

In light of the rulings above both denying and granting summary judgment, trial will proceed as scheduled.  The parties shall appear for a final pretrial conference on May 24, 2011 at 2:00 p.m.

---

[80] *Id.* at 1187.

[81] *See, e.g., Price v. County of San Diego*, 990 F. Supp. 1230, 1244 (S.D. Cal. 1998) (no immunity when officers use unreasonable force); *Scruggs v. Haynes*, 252 Cal. App. 2d 256, 266 (Ct. App. 1967) (noting that immunity does not apply where officers act unreasonably in an arrest situation); and *Michenfelder v. City of Torrance*, 28 Cal. App. 3d 202, 207 (Ct. App. 1972) (noting that a public employee "may under some circumstances incur liability for false arrest or false imprisonment").

1 | Trial shall commence on June 13, 2011 on 9:30 a.m.

2 | Dated: March 22, 2011

*[Signature]*
PAUL S. GREWAL
United States Magistrate Judge